**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 5, 2013

No. 12-20599

Lyle W. Cayce
Clerk

DANIELS HEALTH SCIENCES, L.L.C.,

Plaintiff - Appellee

v.

VASCULAR HEALTH SCIENCES, L.L.C.,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before WIENER, CLEMENT, and PRADO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This dispute arises from the marketing and sale of the cardiovascular health drug Arterosil. Daniels Health Sciences ("DHS") engaged Vascular Health Sciences ("VHS") to market and sell the drug Provasca. After that relationship ended, VHS began to manufacture, market, and sell Arterosil, a product similar in many respects to Provasca. DHS sued VHS for misappropriation of trade secrets, breach of contract, and trademark violations. The district court first granted a temporary restraining order on the grounds that DHS would likely succeed on its breach of contract and misappropriation of trade secrets claims. It later granted a preliminary injunction on the same

No. 12-20599

grounds, also finding a substantial threat of irreparable injury absent an injunction, that the balance of hardships favored the plaintiff, and that the public interest would not be disserved by a grant of injunctive relief. VHS filed a motion in this court requesting a stay of the injunction, which was granted, and now appeals the grant of the preliminary injunction and its scope. We AFFIRM the preliminary injunction, lift the stay, and remand to the district court with instructions to expedite trial and to attempt to narrow its preliminary injunction.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2007, a dietary supplement company called Endomatrix filed for bankruptcy. One of its researchers, Dr. Daniels, purchased Endomatrix's intellectual property out of the bankruptcy estate. This property included the trademark for a dietary supplement named Provasca and the leftover inventory and raw materials for the supplement. Dr. Daniels approached his brother, David, and a marketing executive, Robert Long, in 2010 to help him secure funding for further research and marketing of Provasca. They formed two entities in 2011: DHS to research Provasca and VHS to market the supplement. Dr. Daniels compiled a distilled version of the science and research behind Provasca into a PowerPoint presentation titled "The Path to Provasca" to educate David Daniels and Long on the supplement and help them communicate its potential to investors. Dr. Daniels required that VHS receive his approval before it presented potential investors with information on the supplement, including The Path to Provasca, and also that VHS have them sign a Confidentiality and Non-Disclosure Agreement ("CNDA") prior to the presentation. He also prohibited VHS from presenting information on the supplement to venture capital groups and others that might seek to use it independently. Moreover, according to DHS's complaint, before sharing information with VHS, "Dr. Daniels made it clear that the information he was

2

sharing needed to be kept confidential." If VHS principals had not agreed to those terms, "Dr. Daniels wouldn't have shared [the information] with them."

A year after assembling The Path to Provasca, Dr. Daniels also had VHS sign a CNDA. DHS was less successful, however, in reaching a licensing agreement with VHS, and in February 2012, VHS called off the deal. Despite severing its ties with DHS, VHS continued to attempt to secure investors for a supplement. It also developed a rival product, Arterosil. Provasca and Arterosil both contain the same seaweed extract alleged to help repair and maintain blood vessel walls. But Provasca's other ingredient is L-Arginine, an amino acid, while Arterosil has a blend of fruit and vegetable extracts in addition to the seaweed extract.

DHS filed suit, asserting that VHS violated the CNDA by using confidential information to develop and market Arterosil. It also alleged misappropriation of trade secrets and trademark violations, among several other claims. It requested and obtained a temporary restraining order to prevent VHS from using DHS's confidential information to research or sell Arterosil. It then filed for a preliminary injunction. Following briefing, the district court heard two days of testimony on the merits of the injunction. Three weeks later, the court granted the injunction. The court concluded, based on its factual findings, that DHS was substantially likely to succeed on its breach of contract and trade secret misappropriation claims. It went on to determine that DHS faced a substantial threat of irreparable injury absent an injunction, which outweighed the harm that might result if the injunction was granted. Finally, it concluded that an injunction would not disserve the public interest. VHS moved to clarify the scope of the injunction, and the court denied the motion.

VHS appeals, arguing that this court should vacate the injunction because DHS did not sustain its burden of proof, and because the injunction covered activities that did not involve the use of DHS's alleged confidential information.

No. 12-20599

A panel of this court granted VHS's motion to stay the preliminary injunction pending appeal and expedited the appeal.

## STANDARD OF REVIEW

Reviewing a district court's grant of a preliminary injunction, this court asks "whether the issuance of the injunction, in the light of the applicable standard, constitutes an abuse of discretion." *Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 34 (5th Cir. 1989) (citation and alterations omitted). "[F]indings of fact that support the district court's decision are examined for clear error, whereas conclusions of law are reviewed *de novo*." *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 284–85 (5th Cir. 1999).

## DISCUSSION

VHS asks the court to vacate the district court's preliminary injunction. It contends that DHS did not offer proof that it met the standard for a preliminary injunction. VHS also argues that the court did not limit the injunction to use of DHS's alleged confidential information.

### I. The district court's grant of the preliminary injunction

VHS first argues that the district court erred when it found that DHS carried its burden of proof for each of the four requirements for a preliminary injunction: substantial likelihood of success on the merits, substantial threat of irreparable harm absent an injunction, a balance of hardships in DHS's favor, and no disservice to the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Because the district court found sufficient facts to support its conclusion that the four requirements were met, however, it did not abuse its discretion by granting the injunction.

*A. Likelihood of success on the merits*

VHS argues that the district court erred in determining that DHS was likely to succeed on its breach of contract and misappropriation of trade secrets claims. To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment. *See Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011). With respect to the contract claim, VHS first contends that DHS did not show damages. It is true that the court did not specifically discuss damages in the section of its opinion on the merits of DHS's contract claim. But it later expressly observed that VHS's alleged breach and misappropriation would impair Provasca's chances at FDA approval for medical use and make it difficult for DHS to secure research funding for the drug. These findings are sufficient to support the court's conclusion that DHS likely will be able to prove damages at trial.

Next, VHS argues that the district court did not identify the confidential information that VHS allegedly used in breach of its agreement with DHS. But the court found that "Dr. Daniels disclosed [in meetings with VHS] new scientific and clinical research, some of which he found in the public domain, but had compiled and distilled." It also found that "the compilation was not public knowledge" and that Dr. Daniels "later expanded that compilation into a presentation entitled 'The Path to Provasca.'" The court went on to explain:

> The evidence shows that after learning the science and reviewing the compilation of research that Dr. Daniels generated and produced for fundraising, [VHS] and its operatives set out to delegitimatize Provasca and produce their own product, all without notice or [DHS's] permission. The CNDA prohibits this conduct; hence, the Court is of the view that a factfinder will conclude that [VHS] breached its agreement with [DHS].

These findings specifically identify the confidential information that VHS misused and how it misused that information in breach of the CNDA. Although, under VHS's interpretation of the CNDA, the agreement does not cover this information, the district court did not err in determining that the ultimate

factfinder would likely agree with DHS that the information is covered. In particular, the district court noted that the CNDA broadly includes "all confidential or proprietary written, recorded, electronic or oral information . . . (whether such confidentiality or proprietary status is indicated orally or, whether or not the specific words 'confidential' or 'proprietary' are used)."

VHS also argues that DHS did not offer sufficient evidence for the district court to conclude that DHS likely would succeed on its trade secrets claim. To establish trade secret misappropriation in Texas, a plaintiff must show "(a) the existence of a trade secret; (b) a breach of a confidential relationship or improper discovery of the trade secret; (c) use of the trade secret; and (d) damages." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991) (citation omitted) *aff'd sub nom. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). VHS contends that the first requirement was not met because neither DHS nor the district court specifically identified the alleged trade secret, and, in any event, DHS had no trade secrets because all of its research on the cardiovascular benefits of seaweed extract was public knowledge. This argument is largely repetitive of VHS's charge that the confidential information was not identified in the breach of contract claim because no such information existed. But in this case, the court looks to the legal definition of a trade secret rather than the broad contractual definition of "confidential information" in the CNDA.

"A trade secret is any formula, pattern, device or *compilation of information* used in one's business, and which gives an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958)) (emphasis added). Under Texas law, this trade secret determination is made by weighing six factors: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the

extent of measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Tewari De–Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 610 (5th Cir. 2011) (quoting *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009)). Although "[i]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret," this court has "specifically rejected the contention that a combination of disclosed technologies cannot itself constitute a trade secret." *Id.* at 611, 613 (citations and internal quotation marks omitted).

As with the breach of contract claim, the district court specifically identified Dr. Daniels's "compilation [that] was not public knowledge" of "new scientific and clinical research, some of which he found in the public domain," but which he had "compiled and distilled" and later expanded into The Path to Provasca. The district court did not err when it concluded that this compilation of information, consisting partially of disclosed technologies, nevertheless met the standard for a trade secret under Texas's six-factor test. Although it did not analyze each factor, the court found that (1) the compilation "was not public knowledge"; (2) the compilation consisted of "Dr. Daniels' concept and his work behind Provasca"; (3) "[b]efore sharing his confidential information with his brother and others, Dr. Daniels insisted that the information that he shared with them be kept confidential"; and (4) it had taken Dr. Daniels "many years of scientific research" to develop the information. These findings are sufficient to support the district court's determination that the compilation is a trade secret.

Finally, VHS challenges the district court's conclusions that VHS and DHS had a confidential relationship and that VHS used the alleged trade secret to

develop and market Arterosil.  VHS claims that it had no confidentiality obligation when DHS disclosed The Path to Provasca because there was no oral agreement on confidentiality in place at that time.  However, under Texas law, an agreement is not required to prove the existence of a confidential relationship.  "[A]n express agreement [is] not necessary where the actions of the parties, the nature of their arrangement, the 'whole picture' of their relationship established the existence of a confidential relationship." *Furr's Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. App.—El Paso 1964, writ ref'd n.r.e) (citing *Huffines*, 158 Tex. 566); *see also H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 35–36 (Tex. App.—Corpus Christi 1997).

There is sufficient evidence in the pleadings and exhibits to present a prima facie case that VHS should have understood that the information DHS provided was confidential.  As stated above, the district court found that "[b]efore sharing his confidential information with his brother and others, Dr. Daniels insisted that the information that he shared with them be kept confidential.  At least, this was the agreement between Dr. Daniels, David Daniels and Bob Long."  Whenever VHS sought presentation materials from Dr. Daniels, he specified that presentations could only be made to potential investors and not others who might use the information for their own ends.  Further, Dr. Daniels required VHS to obtain his approval before each use of the information, and to have meeting attendees sign a nondisclosure agreement.  Dr. Daniels's sharing of the information was contingent on VHS's agreement with these conditions.  This evidence is sufficient to constitute a prima facie case that DHS and VHS had established a confidential relationship—regardless of the absence of an express agreement.

With regard to VHS's use of the alleged confidential information, VHS argues that it "independently" developed Arterosil, and, even if it did not, DHS must show that VHS used the entire trade secret compilation, not merely pieces

of publically available information within it.    Despite these claims of independence, the court found that "[w]ithin a few months" of breaking ties with DHS, VHS was able to develop a "rival product" and "make the same essential claims [about it] that were attributed to Provasca."    Furthermore, in its view, "[t]he evidence shows that after learning the science and reviewing the compilation of research that Dr. Daniels generated and produced for fundraising, [VHS] and its operatives set out to delegitimatize Provasca and produce their own product, all without notice or [DHS's] permission."    These findings, although weaker, are still enough to support the court's conclusion that VHS used the compilation itself to develop Arterosil.    Because DHS need only present a prima facie case, rather than meet the standard for summary judgment, to establish a likelihood of success on the merits, the district court's findings are sufficient. It did not err when it determined that DHS satisfied this element of the preliminary injunction test.

### B. *Irreparable harm*

To satisfy this prong of the preliminary injunction test, DHS must show that it is "likely to suffer irreparable harm," that is, harm for which there is no adequate remedy at law.    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Janvey*, 647 F.3d at 600.    VHS's only argument on this element of the test is that DHS has not shown that irreparable harm is likely rather than merely possible.    VHS contends that the claim of reputational harm is "speculative."    It is true that "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant."    *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).    But Dr. Daniels testified that other scientists in the field were familiar with his work and that a poor knock-off would be associated with him to his reputational detriment.    The district court did not err when it credited this unrebutted testimony and concluded that such harm was likely.    VHS also argues that DHS presented no

evidence that VHS's alleged knock-off supplement would threaten funding opportunities for DHS's Provasca.  As with the issue of reputational harm, however, the court heard testimony that an ill-conceived or even unsafe knock-off likely would damage DHS's funding chances.  Crediting that testimony was not erroneous.

C. *Balance of hardships*

Against these harms, the court weighed the money that VHS has spent to market and sell Arterosil.  It observed that these damages were compensable, that the market for the supplement would not go away, and that there was no evidence of substantial contracts between VHS and supplement vendors.  In light of these findings, the court did not err when it concluded that these harms did not outweigh the likely irreparable injury to DHS absent an injunction.

D. *Disservice to the public interest*

Finally, VHS argues that the injunction disserves the public interest by barring public access to a supplement with significant potential health benefits and prohibiting VHS from turning a profit that it could use for further health research.  But the district court found that the public had a greater interest in the development of "a historical scientific breakthrough" if Dr. Daniels had the chance to substantiate his early research.  The odds of this breakthrough, in the district court's opinion, would be seriously harmed if VHS's sale of Aterosil hurt DHS's funding chances.  The district court also found that the public is served when the law is followed.  It did not err by placing more weight on these latter public interests than on VHS's proffered public interests.

The district court did not clearly err in any of its factual determinations, and it correctly applied the legal standard for issuance of a preliminary injunction to those facts.  Therefore, it did not abuse its discretion in granting the injunction.

## II. The scope of the district court's preliminary injunction

VHS also argues that the preliminary injunction is overbroad because it prohibits "the use, dissemination, destroying, selling, conveying, or distributing of *any information* and/or intellectual property that [VHS] and operatives received from [DHS]." (Emphasis added.)  It also objects that enjoining it "from marketing, selling, advertising, distributing, or conveying any product bearing the word 'Provasca' or derivatives of that term; or product based on the science received and reviewed" is too broad.  VHS points out that this language would prohibit it from disseminating copies of public third-party journal articles that Dr. Daniels included when he compiled The Path to Provasca.  In addition, VHS alleges that the injunction bars it from marketing or selling drugs unrelated to Provasca, such as cholesterol-lowering medications, if they are nevertheless based on "the science received and reviewed" from DHS on general cardiovascular health.

The district court's order granting the injunction must "state its terms specifically" and "describe in reasonable detail" the conduct restrained or required.  FED. R. CIV. P. 65(d).  Furthermore, the court "must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

The issue of whether the injunction complies with Rule 65 presents a close question.  Even though VHS asked the district court to clarify the injunction, VHS has never indicated its desire to disseminate third-party journal articles or market cholesterol drugs.  As the Supreme Court has noted,

> *If defendants enter upon transactions which raise doubts as to the applicability of the injunction*, they may petition the court granting it for a modification or construction of the order. While such relief would be in the sound discretion of the court, we think courts would not be apt to withhold a clarification in the light of a concrete situation that left parties . . . in the dark as to their duty toward the court.

No. 12-20599

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) (emphasis added); *cf. Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969) ("If for some reason Gulf King had doubts about the meaning of any part of the injunction, it could have sought district court clarification."). VHS has not alleged an intent to enter into such transactions. And it is impossible for courts to craft injunctions that address all hypotheticals.[1] Nevertheless, because the injunction is quite broad relative to the "reasonably detailed and sufficiently specific to the underlying action" standard, we instruct the district court on remand to try to narrow the scope of its injunction.

## CONCLUSION

The district court granted DHS's request for a preliminary injunction after making sufficient findings of fact to support each element of the analysis and applying the correct legal standard to those facts. Therefore, we AFFIRM the district court's grant of a preliminary injunction in full and lift the stay of the injunction. We further remand the case and direct the district court to expedite trial on the permanent injunction and to attempt to narrow the breadth of its preliminary injunction.

---

[1] In its Emergency Motion to Clarify the Preliminary Injunction to the district court, VHS alleged that the injunction was unclear as to whether VHS's ongoing clinical trials of Arterosil were enjoined. The district court's refusal to clarify whether the injunction covered such trials may have been erroneous, but VHS does not raise this issue on appeal.